UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HERMAN MILLER, INC.,
a Michigan Corporation,

       Plaintiff,

                                      File No.  1:04-CV-781

v.

                                      HON. ROBERT HOLMES BELL

A. STUDIO s.r.l.,
an Italian Limited Liability Company,

       Defendant.

_____/

**O P I N I O N**

Herman Miller, Inc. ("Herman Miller") has filed suit against A. Studio, s.r.l. ("Studio") alleging the following claims: trademark and trade dress infringement, dilution, and false designation under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), 1125(c), and unfair competition, false endorsement, and right of publicity pursuant to state law. Herman Miller's complaint stems from Studio's reproduction and sale of a renowned piece of furniture originally produced for and sold by Herman Miller and its use of the name of the furniture designer, Charles Eames. This matter is before the Court on two motions for summary judgment filed by Studio addressing two affirmative defenses, fair use and laches. For the reasons that follow, Studio's motions for summary judgment are denied.

I.

Herman Miller is a manufacturer of home and office furniture.  The company markets and sells its furniture throughout the United States and worldwide.  Herman Miller produces its furniture in close association with various designers who design the furniture that the company then manufactures and sells.  This case involves the furniture designs of Charles and Ray Eames (collectively "Eames").  Herman Miller and Eames (and thereafter the Eames estate) have had a business relationship since 1946.  During this time, Eames designed over twenty different furniture pieces for sale by Herman Miller.  As a result of this longstanding relationship, Herman Miller registered "EAMES" as a trademark.  U.S. Trademark Reg. No. 1,187,673 (Registered Jan. 26, 1982), Compl. Ex. E (Docket #1).  Herman Miller also owns the right to publicize the names and likenesses of Charles and Ray Eames.

While Eames designed tables, chairs, and sofas, among other things, for Herman Miller, this case involves the lounge chair and ottoman designed by Eames for Herman Miller in 1956.  The chair consists of a curved, molded wood shell, a five-legged swivel base, and black leather upholstery.  The parties agree that the lounge chair and ottoman is Eames' most well known design and is recognized as one of the most significant furniture designs of the 20th century.  By way of illustrating the lounge chair's preeminence, it is part of the Museum of Modern Art's permanent collection.  Since the lounge chair was first produced, Herman Miller has sold over 100,000 chairs in the United States.  The design of the lounge chair has never been the subject of a patent, however, in 2003, Herman Miller registered the

2

design configuration of the lounge chair with the United States Patent and Trademark Office. U.S. Trademark Reg. No. 2,716,843 (Registered May 20, 2003), Compl. Ex. F (Docket #1).

The defendant in this case, Studio, is an Italian furniture company that began operating in 1993. Studio markets furniture reproductions of "modern classic design." One of Studio's featured product lines is called the "Alivar Museum Collection." This collection consists of reproductions of historically significant furniture originally designed by various well-known 20th century furniture designers. Studio created its Museum Collection line through the lease and eventual purchase of the assets of a bankrupt Italian furniture company, Alivar s.r.l. Among the assets Studio purchased were molds used to manufacture the furniture reproductions and the "ALIVAR" trademark. Of particular interest to this case, Studio manufactures and sells an exact copy of the lounge chair and ottoman designed by Charles Eames and sold by Herman Miller. The lounge chair and ottoman produced by Studio is virtually indistinguishable from the piece manufactured by Herman Miller.

Studio has marketed the lounge chair in both the United States and internationally through various promotional materials, including, since 2000, an internet website. Barbara Lisi Decl. ¶¶ 5-6. During the course of its business, Studio has sold furniture reproductions in eighteen states, including Michigan. From 1993 to 2001, Studio sold 110 lounge chairs. Although Studio does not appear to advertise in newspapers, magazines, or trade publications, it does promote its product line through various catalogs, posters, price lists and brochures. *See* Exhibits B-N, Lisi Decl., Def.'s Br. Mot. Summ. J (Docket #31). According

to Studio, it has distributed these materials throughout Europe and the United States.  Lisi Decl. ¶ 6; Lisi Decl. II ¶ 3.  The advertising materials and website depict each furniture piece, identify the original designer, provide Studio's product number to purchase the item, and often include a short paragraph of biographical information of the designer or historical background of the design.

For example, Studio has produced a large catalog which contains each product sold under the Museum Collection line.[1]  Exhibit C, Lisi Decl.  The products are arranged by designer.  The "Charles Eames" section is noted by his name, picture, and birth and death dates.  The section includes photographs of the seven furniture pieces originally designed by Eames that Studio has copied and markets for sale, including the lounge chair.  The lounge chair is pictured with the name "Charles Eames" in the upper right hand corner and "ALIVAR," Studio's trademark, in the lower left hand corner.  The following page contains design specifications of the chair, the date of original design, a product number and the following paragraph in both Italian and English:

> This lounge chair is, certainly one of the most famous modern lounge chairs. As a "status symbol" it ranks with the chair of Mies van der Rohe for the Barcelona Pavilion and the Chaise Longue of Le Corbusier.  Furthermore, it has the well earned reputation of being one of the most luxurious and confortable (sic) of all modern chairs.  It represents a notable contribution toward the mid-century trend in design away from the austere geometrical forms of early modern design toward sculptural, organic forms.  The striking

---

[1] The information contained in the catalog is substantially similar to that contained on Studio's website.  *See http://www.alivar.com/collection.htm (last visited May 3, 2006).*

4

five pronged base of black aluminum with polished top is one of the most distinctive features of this chair.

Exhibit C, Lisi Decl.

A.     Herman Miller's Policing Efforts and Knowledge of Studio's Activities

Since Eames first designed the lounge chair for Herman Miller, third parties have attempted to copy and sell it.  Herman Miller has been aware of this market and has attempted to enforce its trademark rights against companies producing knockoffs of the lounge chair.  Between 1971 and 1995, Herman Miller sent approximately 77 "cease and desist" letters to 66 different companies regarding alleged infringement of the EAMES trademark.  Herman Miller's cease and desist letters were limited to asserting its rights in the Eames' name only.  In fact, in one instance, Herman Miller's counsel advised a furniture store that was selling a copy of the lounge chair on the proper method in which to advertise the chair without infringing the EAMES trademark.  Herman Miller's counsel did not object to the actual sale of the lounge chair.  Prior to 1995, Herman Miller did not assert trade dress rights in the design configuration of the lounge chair against any of the companies manufacturing and selling Eames lounge chair knockoffs.

Beginning in 1995, however, Herman Miller did begin directly asserting its trade dress rights in the lounge chair through "cease and desist" letters and lawsuits.  James Christenson Decl. II ¶ 2.  The first of these lawsuits was filed against Palazzetti Imports & Exports, Inc., in the Eastern District of Michigan.  Like Studio, Palazzetti was engaged in selling exact copies of the Eames lounge chair.  Herman Miller alleged the identical claims against

5

Palazzeti as it has alleged against Studio in this case. After a jury returned a verdict in favor of Herman Miller on its trademark infringement and dilution, unfair competition, and right of publicity claims, both sides appealed. Herman Miller also appealed the district court's pre-trial dismissal of its trade dress and false advertising claims, the district court's grant of summary judgment in favor of Palazzetti on the issue of laches as well as a portion of the permanent injunction entered against Palazzetti allowing it to "fairly identify Eames as the original designer of the reproductions by Palazzetti."

The Sixth Circuit reversed the district court's grant of summary judgment on Herman Miller's trade dress claim, holding that there was sufficient evidence to create a genuine issue of material fact as to whether the trade dress acquired secondary meaning. *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 315-16 (6th Cir. 2003). The court also directed the district court to address Palazzetti's affirmative defense of abandonment of trade dress rights on remand. *Palazzetti*, 270 F.3d at 311. The court upheld the scope of the permanent injunction limiting Palazzetti's use of Eames' name to the accurate identification of furniture "based on original designs of Charles and Ray Eames." *Id*. at 320. The court also upheld the district court's entry of summary judgment in favor of Palazzetti with respect to laches. *Id*. at 323. On remand, the district court denied Palazzetti's motion for summary judgment on the issue of abandonment. Thereafter, the parties entered into a confidential settlement agreement.

6

During the course of discovery in the *Palazzetti* case, Herman Miller learned that Palazzetti's lounge chair reproductions were manufactured by two Italian companies, Alivar, s.r.l., and Tre D, s.r.l.[2]  Following this discovery, Herman Miller sued both companies for trade dress and trademark infringement and obtained default judgments against them. According to Herman Miller's general counsel, James Christenson, the company discovered Studio's allegedly infringing activities on December 18, 2001.  Christenson Decl. II ¶ 3. Thereafter, Herman Miller sent Studio a "cease and desist" letter on February 21, 2002. Following the initial letter, attorneys for the two furniture companies engaged in multiple rounds of correspondence seeking a resolution short of litigation.  These efforts proved unfruitful and Herman Miller filed suit against Studio in November 2004.

In this case, Herman Miller asserts six claims against Studio based upon its trade dress rights in the lounge chair, the EAMES trademark, and Herman Miller's right of publicity in the Eames name and likeness.  Herman Miller's claims include trademark infringement and dilution, unfair competition, right of publicity, and false endorsement stemming from Studio's use of Eames' name and likeness in connection with its products.  Herman Miller also asserts trade dress infringement, dilution, and unfair competition claims stemming from Studio's production and sale of the lounge chair reproduction.  In the motions presently before this Court, Studio asserts that its use of the lounge chair and Eames' name and likeness

---

[2]According to Studio's counsel, Tre D merged with Studio in December 1999.

is permissible under the fair use defense provided in the Lanham Act and seeks summary judgment on its laches and estoppel by laches affirmative defense.

## II.

Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005); *Layne v. Bank One, Ky, N.A.*, 395 F.3d 271, 275 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005).

In this case, Studio has moved for summary judgment on two of its affirmative defenses. "[W]here the moving party has the burden – the plaintiff on a claim for relief or defendant on an affirmative defense – his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary*

*Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)).  The Sixth Circuit has explained that the party with the burden of proof faces "a substantially higher hurdle" when seeking summary judgment in his favor.  *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)).  The moving party's initial summary judgment burden is higher, "in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id.* (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000)).  Thus, "[s]ummary judgment in favor of the party with the burden of persuasion, however, is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

III.

A.    *The Fair Use Defense*

Section 33(b)(4) of the Lanham Act, 15 U.S.C. § 1115(b)(4), permits a party in an infringement case to defend on the ground that its use of "the name, term, or device charged to be an infringement is a use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin."  15 U.S.C. § 1115(b)(4); *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 756 (6th Cir. 1998).  This affirmative defense

9

is commonly known as "fair use," and is a complete defense to liability under the Lanham Act, "even if a defendant's conduct would otherwise constitute infringement of another's trademarks." *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997).

The fair use defense is a recognition of the fact that trademark protection does not grant the trademark holder a monopoly over the word, image, or device chosen as a trademark, but only grants the holder the exclusive right over the secondary meaning of the mark. *See, e.g., Brother Records, Inc. v. Jardine*, 318 F.3d 900, 906 (9th Cir. 2003) ("[The fair use defense] in essence, forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods.") (quoting *New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992)); *United States Shoe Corp. v. Brown Group, Inc.*, 740 F. Supp. 196, 199 (S.D.N.Y. 1990) ("A user of a descriptive word may acquire the exclusive right to use that descriptive word *as an identifier* of the product or source.  This, however, does not justify barring others from using the words in good faith *for descriptive purposes* pertinent to their products.") (emphasis in original); 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:45 (4th ed. 2004) ("MCCARTHY ON TRADEMARKS") ("The only right of exclusion that trademark law creates in a descriptive word is in the secondary, new, 'trademark' meaning of the word that plaintiff has created.  The original, descriptive primary meaning is always available for use by others to describe their goods, in the interest

of free competition."). Others may always use the word or image in its original, primary descriptive sense to describe their own product. *Palazzetti*, 270 F.3d at 319 ("Under the doctrine of 'fair use,' the holder of a trademark *cannot* prevent others from using the word that forms the trademark in its *primary* or *descriptive* sense.") (emphasis in original); *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 (2d Cir. 1995) ("It is a fundamental principle marking an outer boundary of the trademark monopoly that, although trademark rights may be acquired in a word or image with descriptive qualities, the acquisition of such rights will not prevent others from using the word or image in good faith in its descriptive sense, and not as a trademark."). In evaluating a defendant's fair use defense, the court must consider whether defendant has used the mark: (1) in its descriptive sense; and (2) in good faith. *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 639 (7th Cir. 2001); *Review Directories, Inc. v. McLeodusa Publ'g Co.*, 236 F. Supp. 2d 810, 812 (W.D. Mich. 2001) (Enslen, J.). For purposes of this motion, Studio does not dispute that Herman Miller has valid trademark rights in the design configuration of the lounge chair and the name, Charles and Ray Eames.

      1.    *Fair Use of the Lounge Chair*

The first issue is whether Studio is using the lounge chair descriptively and "otherwise than as a mark." 15 U.S.C. §1115(b)(4); *ETW Corp.*, 332 F.3d at 920. Studio uses the lounge chair, Herman Miller's trademark, as a product for sale to the public. This use of an

exact copy of another's trademark as a commercial product is unlike any descriptive use in previous cases that have been brought to the attention of the Court. The novelty of this purported fair use is some indication of its validity. In determining whether a defendant's use of a trademark is descriptive, courts often assess "the manner in which the mark is used with respect to the product or service sold by the alleged infringer." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 65 (2d Cir. 2000). Such an inquiry is complicated in this case because Studio is not using the trademark "with respect to" or in connection with its own product, it is using an exact replica of Herman Miller's trademark as its product. While Studio has presented evidence regarding it's non-trademark usage of the lounge chair, it has assiduously avoided explaining the descriptive manner in which it uses Herman Miller's trademark. Such an omission is yet another strong indication of the validity of Studio's position in this case.

Studio makes passing reference to its descriptive use of the lounge chair, explaining that it is the "ultimate example of truly descriptive use." Def.'s Br. Mot. Summ. J. at 3. Superlatives aside, no further explanation is given regarding the aspects of Studio's product that the use of the lounge chair describes. *EMI Catalogue P'ship,* 228 F.3d at 65 ("The fair use doctrine permits use of a protected mark by others *to describe certain aspects of the user's own goods*.") (emphasis added). In Studio's reply brief it sheds additional light on its purported descriptive use explaining, "since Miller is claiming the entire configuration . . . of the chair and ottoman as its mark, the design of the chair and ottoman describe the chair

and ottoman." Def.'s Reply Br. at 1 n. 3 (Docket #110) (citation omitted). This too is unsatisfactory and fails to adequately address the purported descriptive use of the lounge chair. It is nothing more than circular logic. Furthermore, if such reasoning were accepted, the fair use exception would swallow the law of trademark in its entirety. In the absence of any showing that Studio is using Herman Miller's trademark to describe Studio's product, the fair use defense cannot apply. *See Palazzetti*, 270 F.3d at 319; MCCARTHY ON TRADEMARKS § 11:45 ("fair use analysis is appropriate where a defendant has used the plaintiff's mark *only to describe his own product*, and not at all to describe the plaintiff's product.") (emphasis added).

Studio's inability to satisfactorily articulate its descriptive use may be attributable to the fact that it is difficult to conceive how the design configuration of the lounge chair can be used descriptively. The design configuration of a product is unlike a word mark which can clearly have both a secondary, trademark meaning as well as an original descriptive sense. A potential infringer can use a word mark in its original descriptive sense but cannot use the term in its secondary, trademark sense. The caselaw is replete with such permissible descriptive uses. *See, e.g., Cosmetically Sealed Indus., Inc.*, 125 F.3d at 30 (holding that defendant's use of the words "Seal it with a Kiss," was a fair use because it described an action "the sellers hope consumers will take, using their product."); *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055 (7th Cir. 1995) (holding that defendant's use of the phrase "sweet-tart" was descriptive of two attributes of defendant's product, a fruit juice

drink); *Packman*, 267 F.3d at 641 (noting that "[d]escriptive terms 'impart information directly'" and concluding that defendant's use of the phrase "The joy of six" was descriptive of a newsworthy event and the happiness associated with the Chicago Bulls' sixth NBA championship) (*quoting M.B.H Enter., Inc. v. WOKY, Inc.*, 633 F.2d 50, 54 (7th Cir. 1980); *Sports Authority, Inc. v. Abercrombie & Fitch, Inc.*, 965 F. Supp. 925 (E.D. Mich. 1997) (holding that defendant's use of term "authority" was a fair use because it described defendant's "century-long tradition of outfitting customers for the outdoors," and was not featured prominently); *Wonder Labs, Inc. v. Procter & Gamble Co.*, 728 F. Supp. 1058 (S.D.N.Y. 1990) (usage of the phrase "The dentists' choice for fighting cavities" was a fair use where it described an important aspect of defendant's toothpaste).  Unlike the usage of a word mark in its original, descriptive sense, it is unclear how the design configuration of the lounge chair can have a primary, descriptive meaning.  Without such descriptive capability, the fair use defense does not apply.  *See Car-Freshner Corp.*, 70 F.3d at 269 ("It is true that the [fair use] doctrine can apply only to marks consisting of terms or images with descriptive qualities.  That is because only such terms or images are capable of being used by others in their primary descriptive sense."); *Brother Records, Inc.*, 318 F.3d at 905 ("[T]he classic fair use defense . . . applies only to marks that possess both a primary meaning and a secondary meaning – and only when the mark is used in its primary descriptive sense rather than its secondary trademark sense.") (emphasis added); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 28 cmt. a ("Reasonable use of a descriptive term by another solely to

describe the nature or characteristics of its own goods or services will not subject the user to liability for infringement.").

At least one court has extended the defense beyond words or phrases to include such things as shape of a product, that are used in a broader, descriptive sense. *See Car-Freshner Corp.*, 70 F.3d at 270. A review of the Second Circuit's decision further demonstrates that fair use is not applicable to this case. In *Car-Freshner*, plaintiff, an automotive air-freshner manufacturer, held trademark rights in the pine-tree shape of its product, a cardboard car air freshner. 70 F.3d at 268. Defendant, a home air freshner manufacturer, produced a plastic pine-tree shaped air freshner that plugged into an electrical outlet. *Id*. Plaintiff sued claiming trademark infringement and defendant asserted the fair use defense.

Although the district court granted summary judgment in defendant's favor on the ground of absence of likelihood of confusion, the Second Circuit affirmed based on the fair use defense. After noting that whether plaintiff's own usage of the trademark was descriptive was not a prerequisite for a finding of fair use, and that the focus is on defendant's use of the mark, the court held that defendant's use of the pine tree shape was descriptive. *Id*. at 270. The court explained that fair use permitted "others to use a protected mark to describe aspects of their own goods," so long as the use was in good faith and not as a mark. *Id*. In light of this, the court held that defendant's use was descriptive because it described two aspects of defendant's product: 1) the pine scent of the air freshening agent and 2) the Christmas season, because the pine tree is traditionally associated with the holiday and the product was sold

15

during that season. *Id.* Consequently, the court held that defendant was protected by the fair

use defense. *See also Cosmetically Sealed Indus., Inc.*, 125 F.3d at 30 (extending permissible

descriptive use to include description of "an action that the sellers hope consumers will take"

and holding that defendant's use of the words "Seal it with a Kiss" were within the fair use

defense).

In this case, unlike *Car-Freshner* and the other cases cited above, there is no

indication that Studio's use of the lounge chair describes an aspect of its product, an action

to be taken, or any other broader, descriptive function. In short, Studio has not shown that

it is using Herman Miller's trademark in a descriptive sense. While Studio has indicated that

it uses the lounge chair in conjunction with its own "Alivar" trademark and uses the lounge

chair in the same manner as other furniture reproductions, *see EMI Catalogue P'ship*, 228

F.3d at 64-65 (noting that a relevant factor in determining if a use is descriptive is the

"physical nature of the use in terms of size, location, and other characteristics in comparison

with the appearance of other descriptive matter or other trademarks.") (quoting

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 28 cmt. c.), this evidence does not

overcome the absolute dearth of evidence or explanation regarding the descriptive nature of

Studio's use. Accordingly, Studio cannot avail itself of the fair use defense because it has

failed to show that it is using the lounge chair in a descriptive sense.

2.    *Fair Use of the Eames Name*

Studio next seeks summary judgment on its affirmative defense of "fair use" of Eames' name in connection with its advertising and promotional materials.  Studio contends that it is simply using the Eames name to truthfully describe the original designer of the furniture it reproduces and sells.  Herman Miller asserts that Studio's use of the name is a violation of its exclusive right to publicize Eames' name and likeness.

Although the parties dispute the application, they agree that *Palazzetti* is instructive on the permissible use of the Eames name.  In *Palazzetti*, the district court entered a permanent injunction forbidding defendant from using Eames' name or likeness as a trademark or in connection with the sale of furniture, but allowing it to "fairly identify Charles Eames and/or as the original designers of the furniture after which [defendant] patterned or reproduced its own furniture."  270 F.3d at 318.  The Sixth Circuit affirmed the scope of the injunction recognizing that "a right of publicity injunction cannot prevent a defendant from making reference to a person's name or likeness in all circumstances, but only in cases of 'unauthorized commercial use or exploitation of [the plaintiff's] rights.'"  *Id.* (quoting *Elvisly Yours*, 936 F.2d at 897).

In upholding the scope of the injunction, the court recognized that several competing interests were at play and required proper balancing.  The interests involved included Herman Miller's right of publicity in the name and likeness of Eames, defendant's right to reproduce furniture originally designed by Eames, and defendant's fair use trademark rights.  *Id.* at 319.

The court held that the district court properly balanced these competing interests by preventing the use of Eames' name and likeness in any circumstance except "to identify accurately [defendant's] furniture as based on original designs of Charles and Ray Eames." *Id*. at 320.  This balance prevented defendant from excessive commercial use of Eames' name but afforded it the ability to avoid "false suggestions of endorsement of sponsorship, because it enables [defendant] to state that its furniture is based on the Eameses' designs and, therefore, is not an original piece of furniture designed by the Eameses."  *Id*. (quotation marks omitted).

With these principles in mind, the Court turns to an evaluation of the evidence.  Studio contends that its use of Eames' name and likeness in its advertising materials is consistent with *Palazzetti*, in that it merely accurately identifies its furniture as reproductions patterned after his original designs.  Eight of the exhibits filed with the Court use Eames' name.  *See* Exhibits B, C, D, F, G, I, M, P, Lisi Decl I.  After reviewing the evidence, the Court concludes that a reasonable jury could conclude that Studio used the name in a trademark sense and in a manner that exceeded the bounds permitted in *Palazzetti*.

Exhibits B, F, and G are a series of small catalogs.  Exhibit D is a smaller foldout pamphlet displaying certain products.  Exhibit I is a price list.  In each item, Eames' name appears near a photograph of a furniture reproduction he originally designed.  Although it varies between each exhibit, in general, the name is either in all capital letters, a larger font than the other text, or in bold typeface.  The use of distinctive type settings is an indication

that Studio has gone beyond merely identifying the original designer and is using the name as a trademark.  MCCARTHY ON TRADEMARKS § 3.3 ("Some of the common markers of whether a word, phrase or picture is being used as a trademark are: larger-sized print, all capital letters or initial capitals, distinctive or different print style, color, and prominent position on label or advertising copy.").  Moreover, a more troubling aspect of the materials is that there is no indication in the catalogs, pamphlet, or price list that the furniture pictured is a copy or reproduction, it simply provides Eames' name.  While this may accurately identify the original designer, it leaves the impression that Eames may have been involved with or endorsed Studio's furniture.  This usage does not satisfy the *Palazzetti* decision's instruction that a permissible usage is "to identify accurately its furniture as based on original designs of Charles and Ray Eames."  270 F.3d at 320.  While it is not necessary for Studio to use the exact phrasing in *Palazzetti*, absent some indication that the furniture is a copy and is based on Eames' original design, a consumer could reasonably believe that Eames was involved in the manufacture of Studio's furniture.  *Hypertherm, Inc. v. Precison Prods., Inc.*, 832 F.2d 697, 700 (1st Cir. 1987) (holding that defendant has a right "to identify the product it has copied, *so long as no misrepresentation is made and no confusion is generated as to the source, sponsorship, or identity of the ersatz goods.*") (emphasis added).

The ambiguous nature of simply using the name without an indication that it is a reproduction is illustrated by another example of Studio's advertising usage of Eames' name. Exhibit M is a poster featuring the various furniture pieces in the Alivar Museum Collection.

19

The Eames-designed furniture reproductions are displayed in a horizontal row.  At the beginning of the row it states "patterned after the design of Charles Eames," in all capital letters.  Unlike the small catalogs, pamphlet, and price list this identification is clearly permissible because it both accurately identifies the original designer and clearly signifies that Studio's product is a reproduction.  It is not left to the consumer to decide whether Eames endorsed or produced Studio's furniture.

The Court is also troubled by Studio's usage of Eames' name on its website and in its large catalog.  The catalog and website use the name both properly and improperly.  On each page of the Eames section of the catalog, his name appears alone in the upper right hand corner.  This use goes beyond simply identifying the original designer.  Isolating the name and prominently displaying it in the upper corner of each page is an indication of an impermissible trademark use.  *Pebble Beach Co. v. Tour 18 I Ltd*, 155 F.3d 526 (5th Cir. 1998) (holding that defendant's prominent usage of plaintiff's marks in advertising and promotional materials was a trademark use); *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1248 (9th Cir. 1984) (holding that prominent display of a mark on product was a trademark use).  It is also excessive to include the name on each page when Studio has also used it to truthfully identify the designer of the furniture in other places.  Moreover, the inclusion of biographical and background information goes well beyond simply identifying the original designer and treads upon Herman Miller's right of publicity.

20

Consistent with *Palazzetti* and trademark fair use, Studio may use Eames' name to accurately identify that its furniture is patterned after Eames' original design. A reasonable jury could conclude that Studio's usage of Eames' name in connection with its furniture reproductions infringes upon Herman Miller's trademark and publicity rights in Eames' name. Accordingly, summary judgment is denied.

Studio has also argued that the Court must balance Herman Miller's right of publicity against Studio's First Amendment right to free expression. Studio focuses this argument on the large catalog, which it casts as an artistic work. Studio overstates the importance of its catalog. It is clearly an advertisement, and thus, commercial speech. "Commercial speech is 'speech which does no more than propose a commercial transaction . . . .'" *ETW Corp.*, 332 F.3d at 925 (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). The furniture displayed in the catalog is organized by a product number which corresponds to Studio's price list. Moreover, the introduction to the catalog explains that the furniture is produced at Studio's factory, "where each individual piece is carefully checked to ensure maximum quality down to the finest detail." Exhibit C. The catalog also explains Studio's manufacturing process, extols the virtues of the materials it uses, and describes the various options available in their furniture line. Finally, Studio's phone number, address, and website are also provided. The catalog clearly is an invitation to a commercial transaction and is commercial speech.

That said, commercial speech is entitled to First Amendment protection. *ETW Corp.*, 332 F.3d at 925 (collecting cases). Commercial speech that does not accurately inform the public or that is misleading is not entitled to constitutional protection. *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557, 563-64 (1980). As set forth above, Studio's usage of Eames' name in both its large catalog and other advertising materials could leave the impression that Eames actually designed and was involved with Studio's product, as opposed to the truth, that Studio has patterned its furniture after Eames' original design. Because it is not unreasonable to conclude that Studio's use is misleading, Studio's First Amendment interests, if any, do not preclude finding a violation of trademark law or the right of publicity.

B.     *Laches and Estoppel by Laches*

Studio also contends that it is entitled to summary judgment on its laches and estoppel by laches affirmative defenses. Because the Court concludes that a reasonable jury could find that Herman Miller did not have constructive knowledge of Studio's allegedly infringing activities and did not diligently assert its rights, summary judgment is denied.

Laches is the negligent and unintentional failure to protect one's rights. *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991). In order to prove laches, Studio must show: (1) lack of diligence by Herman Miller, and (2) prejudice to Studio. *Palazzetti*, 270 F.3d at 320-21. The Sixth Circuit applies a strong presumption that a plaintiff's delay in bringing suit for monetary relief is not unreasonable as long as the

22

analogous statute of limitations has not lapsed.  *Id.* at 321.  But, "a delay beyond the []
statutory period is presumptively prejudicial and unreasonable."  *Nartron Corp. v.
STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002).  The applicable statute of
limitations in a trademark case is that for injury to personal property.  *Id.*  Under Michigan
law, the period is three years.  *Id.*; MICH. COMP. LAWS § 600.5805(8).

Before any delay of Herman Miller in asserting its rights can be considered laches,
there must be evidence of knowledge on Herman Miller's part.  *See e.g.*, *Halstead v.
Grinnan*, 152 U.S. 412 (1894); MCCARTHY ON TRADEMARKS, § 31:38.  The parties dispute
whether the period of delay begins when Herman Miller had actual or constructive
knowledge of Studio's activities.  Studio contends that an objective standard applies and,
consequently, focuses on whether Herman Miller should have known of Studio's lounge chair
reproduction.  Herman Miller, on the other hand, emphasizes the period when it actually
learned of Studio's actions.

If the Court focused solely on actual knowledge, summary judgment would clearly be
improper.  Herman Miller has offered evidence that it did not become aware of Studio's
activities until December 21, 2001.  Christenson Decl. II ¶ 3.  Following the discovery,
Herman Miller's counsel sent a cease and desist letter to Studio on February 21, 2002.
Douglas Siegel Decl. ¶ 3.  Thereafter, the parties engaged in a series of correspondence in
an effort to resolve the dispute.  When these efforts failed, Herman Miller filed suit on
November 21, 2004.  Based solely on actual knowledge, it is clear that laches is not

applicable. Herman Miller filed suit within three years of learning of Studio's existence, before the applicable limitations period ended.[3] *See Palazzetti*, 270 F.3d at 321 ("Only rarely should laches bar a case before the analogous statute has run.") (quoting *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir. 1985)). Moreover, Herman Miller cannot be penalized for the period during which it attempted to resolve the dispute short of litigation. *See e.g., Kraft Gen'l Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 136 n. 12 (S.D.N.Y. 1993) (Plaintiff "should not be penalized for any delay arising out of settlement efforts.").

The Sixth Circuit, however, has clearly indicated that a plaintiff's delay in asserting its rights is measured from "when plaintiff had 'actual or constructive knowledge of the alleged infringing activity.'" *Nartron Corp.*, 305 F.3d at 408 (quoting *Dana Corp. v. IPC Ltd. P'ship*, 674 F. Supp. 581, 583 (E.D. Mich. 1987)); *Palazzetti*, 270 F.3d at 321 (rejecting Herman Miller's argument that delay should be measured from the time it was specifically aware of defendant's actions and holding Herman Miller "*should have been aware or should have become aware*" of the lounge chair reproduction.) (emphasis added); *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569-70 (6th Cir. 2000) ("[D]elay attributable to the plaintiff must

---

[3]Studio's reliance on Herman Miller's actual knowledge of the actions of third party manufacturers of lounge chair reproductions as represented by the seventy-seven cease and desist letters sent between 1971 and 1995 is misplaced. "A plaintiff's failure to assert [trade dress] rights against third parties is not relevant to the defense[] of laches." *Elvisly Yours*, 936 F.2d at 894; *see also Libbey Glass, Inc. v. Oneida Ltd.*, 61 F. Supp. 2d 700, 718-19 (N.D. Ohio 1999) (rejecting laches defense where defendant relied upon plaintiff's failure to assert its trade dress rights against third parties).

24

be measured from the time at which the plaintiff knew or should have known that [defendant's] infringement had ripened into a provable claim."); *see also* McCarthy on Trademarks § 31.38 ("Before any delay of plaintiff in suing can be said to constitute laches, it is clear that plaintiff must have been actually or constructively on notice of defendant's activities.").  Accordingly, the Court must determine if there is sufficient evidence in the record to conclude, as a matter of law, that Herman Miller should have known that Studio was reproducing Eames-designed furniture but failed to diligently assert its rights. *Palazzetti*, 270 F.3d at 321.

After reviewing the record, the Court arrives at the same conclusion reached based on Herman Miller's actual knowledge.  That is, that summary judgment on laches is denied.  Studio has failed to carry its burden of demonstrating that no reasonable trier of fact could find in favor of Herman Miller. *See e.g.*, *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (describing defendant's burden when seeking summary judgment on an affirmative defense) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)).  Accordingly, this issue must be submitted to a jury.

Studio contends that Herman Miller should have been aware of its activities at some point between 1993, when it began manufacturing the lounge chair reproduction, and 2000, when it began operating an internet website.  Studio points to the fact that it began manufacturing the lounge chair in 1993, distributed advertising materials in the United

25

States, sold lounge chairs in eighteen states in the past decade, and maintained an internet website since 2000.  Lisi Decl. I ¶¶ 6, 7; Lisi Decl. II ¶ 5.  In addition, in its reply brief, it alleged for the first time that Herman Miller should be charged with constructive knowledge of Studio based upon its failure to inquire into the bankruptcy of Alivar s.r.l., after uncovering this fact during the *Palazzetti* litigation.  Studio contends that such an investigation would have revealed its activity in the reproduction market.

While this evidence is some indication of Studio's presence in the reproduction market and arguably indicates that Herman Miller should have known of Studio, it certainly does not lead to a single conclusion.  The laches defense, and particularly the determination of whether Herman Miller should have known of Studio, is a fact intensive inquiry that cannot be easily resolved on summary judgment.  *See e.g.*, *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000) ("Because the application of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible of resolution by summary judgment."); *PSN Illinois, Inc. v. Ivoclar Vivadent, Inc.*, 398 F. Supp. 2d 902, 906 (N. D. Ill. 2005) ("Because the nature of the laches defense is fact-intensive, summary judgment often will be inappropriate, but may be granted under some circumstances.").  While Studio has pointed to some evidence in the record indicating that knowledge should be attributed to Herman Miller, this is not the only reasonable conclusion.  For example, although Studio has stated that it distributed advertising materials in the United States, there is nothing in the record indicating where these materials were placed, who received these materials, or the

26

volume in which it advertised. *See Palazzetti*, 270 F.3d at 321-22 (upholding summary judgment on laches where Herman Miller knew plaintiff was reproducing Eames-designed furniture, other than the lounge chair, and plaintiff had multiple advertisements in a major newspaper during the four years before Herman Miller filed suit). In fact, it appears that of the sixteen advertising pieces offered by Studio, only two were used before 1997 and the majority were produced after 2000. Def.'s Res. Interogg. No. 6. Moreover, while Studio has sold merchandise in eighteen states, its sales of the Eames lounge chair during the relevant time period are relatively low (110). Based upon this record, the Court cannot say, as a matter of law, that Herman Miller should have known of Studio's activities.

A case cited by Studio is instructive on the disposition of this case. In *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531 (2d Cir. 1964), plaintiff, a French champagne producer, sued a New York champagne company for trademark infringement. Plaintiff held trademark rights in the name "Dom Perignon" and marketed its finest champagne under this name in the United States beginning in 1936. *Chandon Champagne Corp.*, 335 F.2d at 533. In 1954, plaintiff registered the name as a trademark in the United States. Defendant, in 1939, began producing champagne under the name "Pierre Perignon" and registered the name as a trademark in 1943, republishing the registration under the Lanham Act in 1948. *Id*. A few months before defendant registered its trademark, plaintiff's registration was cancelled. *Id*. Defendant's champagne was sold in

27

the United States each year between 1940 and 1961.  Plaintiff did not assert its trademark

right against defendant until 1957.

  The Second Circuit held that plaintiff was precluded from recovery because it failed

to assert its rights in a timely fashion.  The court noted that while laches, "generally includes

proof of actual knowledge by the party claimed to be barred . . . a plaintiff may be barred

when the defendant's conduct has been open and no adequate justification for ignorance is

offered."  *Id*. at 535 (citation omitted).  The court held that plaintiff had constructive notice

because it had "ample opportunity to discover" defendant's trademark registration during its

own registration.  Moreover, both parties advertised in trade journals during the three years

prior to filing suit.  *Id*.  While defendant's activity in *Chandon Champagne* may have been

so open as to impute knowledge to plaintiff, that is not the case here.  Studio certainly has

not registered a similar trademark and although it apparently has advertised, it has not shown

that this advertisement was so extensive as to impute knowledge to Herman Miller.

  In the final analysis, the record in this case does not lead to a single conclusion and

invites the Court to weigh the evidence for and against attributing knowledge to Herman

Miller.  This is a function the Court cannot engage in at this stage of the proceeding.  *See*

*e.g.*, *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001) ("The Court is not to weigh

evidence [under FED. R. CIV. P. 56(c)]; summary judgment 'will not lie . . . if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party.'") (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Whether Herman Miller should

have been aware of Studio at some point between 1993 and 2001 is a question for the jury. As such, this issue precludes the Court from determining whether Herman Miller failed to diligently pursue its rights. Consequently, Studio's motion on its laches defense is denied.

Studio also seeks summary judgment on its estoppel by laches affirmative defense. While laches and estoppel by laches are related, they are distinct concepts. *SCI Sys., Inc. v. Solidstate Controls, Inc.*, 748 F. Supp. 1257 (S.D. Ohio 1990). Laches only precludes monetary relief, while estoppel by laches can defeat a suit for injunctive relief. *Nartron Corp.*, 305 F.3d at 412. While laches is based on the passivity of plaintiff, estoppel looks to the affirmative actions taken by plaintiff. In addition to the elements of laches, in order to prove estoppel by laches, a defendant "must show that it had been misled by plaintiff through actual misrepresentations, affirmative acts of misconduct, intentional misleading silence, or conduct amounting to virtual abandonment of the trademark." *Id.* (quoting *SCI Sys., Inc.*, 748 F. Supp. at 1261-62); *TWM Mfg. Co., Inc. v. Dura Corp.*, 592 F.2d 346, 350 (6th Cir. 1979). Because Studio has failed to prove the elements of laches as a matter of law, as set forth above, it is precluded from a grant of summary judgment on estoppel by laches. *TWM Mfg. Co., Inc. v. Dura Corp.*, 722 F.2d 1261, 1268 (6th Cir. 1983) ("Estoppel requires, *in addition to a showing of laches*, representations or conduct which justify an inference of abandonment of the patent claims.") (emphasis added) (quotation marks omitted). Furthermore, the evidence offered by Studio in support of estoppel by laches comes perilously close to simply establishing Herman Miller's silence in the face of trade dress

29

infringement.  Silence on the part of a plaintiff is not sufficient to establish estoppel by laches. *Nartron Corp.*, 305 F.3d at 412.  Moreover, Studio principally relies on the seventy-seven cease and desist letters sent to third parties between 1971 and 1995.  As mentioned previously, reliance on Herman Miller's actions (or inaction) toward third parties is not relevant to Studio's laches or estoppel by laches claim. *Libbey Glass*, 61 F. Supp. 2d at 718-19.  Accordingly, summary judgment on estoppel by laches is denied.

IV.

For the foregoing reasons, Studio's motions for summary judgment on fair use and laches are denied.  An order will be entered consistent with this opinion.

Date:   ____May 9, 2006____          /s/ Robert Holmes Bell_____
                                      ROBERT HOLMES BELL
                                      CHIEF UNITED STATES DISTRICT JUDGE