UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


HERMAN MILLER, INC.,

        Plaintiff,

                                    File No.  1:04-CV-781

v.

                                      HON. ROBERT HOLMES BELL

A. STUDIO S.R.L.,

        Defendant.

_____/

## O P I N I O N

Herman Miller, Inc., has filed this lawsuit against A. Studio S.R.L. ("Studio") asserting trademark and trade dress infringement, dilution, and false designation under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), 1125(c), as well as unfair competition, false endorsement, and right of publicity claims pursuant to state law.  Herman Miller's claims stem from Studio's production and sale of an exact replica of a world renowned lounge chair manufactured by Herman Miller.  The lounge chair was originally designed by Charles Eames.  Studio produces an exact copy of the Eames' lounge chair and advertises it for sale using Eames' name.  Before the Court are two motions for summary judgment, one from each party.  Studio seeks summary judgment on the trademark and trade dress dilution claims.  Herman Miller moves for partial summary judgment on fair use, an affirmative defense asserted by Studio.  For the reasons that follow, the Court grants in part and denies in part

Studio's motion for summary judgment on the dilution claims and grants Herman Miller's motion for partial summary judgment on the fair use defense.

I.

A.      *Factual Background*

A full recitation of the underlying facts is unnecessary for the resolution of the present motions before the Court.  The facts are fully set forth in the Court's previous opinion dated May 9, 2006.  *See* May 9, 2006 Opinion at 2-8 (Docket #195).  Herman Miller is the manufacturer of various furniture pieces originally designed by Charles Eames.  This case involves what many, including the parties, consider Eames' most famous furniture design: a lounge chair consisting of a curved, molded wood shell, a five-legged swivel base, and black leather upholstery.  Herman Miller owns the right to publicize the Eames' name and likeness and also is the holder of the registered trademark "EAMES" for home and office furniture.  Exhibit E, Pl.'s Compl.  The EAMES trademark was registered with the United States Patent and Trademark Office on January 26, 1982.  Herman Miller also registered the trade dress configuration of the Eames' lounge chair with the United States Patent and Trademark Office on May 20, 2003.  Exhibit F, Pl.'s Compl.  Both the trademark and trade dress registration were granted pursuant to 15 U.S.C. § 1052(f), which permits, "the registration of a mark . . . which has become distinctive of the applicant's goods in commerce."  15 U.S.C. § 1052(f).

2

Studio is an Italian furniture manufacturer that produces reproductions of well-known furniture designs. Since 1993, Studio has produced a reproduction of the Eames' lounge chair. Studio's reproduction is indistinguishable from Herman Miller's lounge chair. In connection with the marketing and sale of its reproduction, Studio uses the name Charles Eames. In light of Studio's manufacture and sale of the lounge chair reproduction and its use of the name Eames, Herman Miller filed the present suit against Studio alleging trademark and trade dress infringement and dilution in violation of the Lanham Act, as well as various state law claims.

B.    *Procedural Background*

Previously, Studio sought summary judgment on two affirmative defenses, fair use and laches. On May 9, 2006, the Court denied both motions for summary judgment. With respect to the fair use defense, the Court held that Studio was required to show that it used the lounge chair and Eames' name, "(1) in its descriptive sense; and (2) in good faith." May 9, 2006 Op. at 11. Although Studio argued that its use of the lounge chair as a product was the "ultimate example of truly descriptive use," the Court held that Studio failed to show that it was using the lounge chair to describe its product. *Id*. at 11-12, 16. Thus, the Court concluded that, absent a showing that the lounge chair was used descriptively, Studio could not avail itself of the fair use defense. *Id*. at 16. The Court also held that while Studio was permitted to use Eames' name to accurately identify its furniture as a reproduction of Eames' original design, a reasonable jury could conclude that the company's usage in its advertising

3

materials infringed upon Herman Miller's trademark rights. Thus, summary judgment was denied.[1]

Thereafter, the Court denied Studio's motion for interlocutory appeal of the denial of summary judgment on the fair use defense as applied to the lounge chair only. Studio sought to immediately appeal the issue of whether the fair use defense is valid where a defendant's use of a trademarked product configuration replicates the entire trademark. May 24, 2006 Opinion at 1-2 (Docket #210). The Court held that an immediate appeal of this issue was unwarranted, and therefore, denied Studio's motion. *Id*. at 3. In the present motions before the Court, Studio seeks summary judgment on Herman Miller's trademark and trade dress dilution claims, contending that federal dilution protection is limited to trademarks that possess inherent distinctiveness, a quality Herman Miller's trademark and trade dress lack, and that Michigan common law does not recognize a trademark dilution cause of action. Herman Miller seeks summary judgment on Studio's fair use defense based upon the Court's previous opinion denying Studio's motion for summary judgment on that issue. Herman Miller argues that Studio is unable to satisfy the descriptiveness element of the fair use defense.

---

[1]The Court also denied Studio's motion for summary judgment on the laches and estoppel by laches affirmative defense, finding that a reasonable jury could find in favor of Herman Miller on these issues. May 9, 2006 Op. at 24, 27.

II.

A.   *Trademark and Trade Dress Dilution*

The law governing trademark dilution is independent and distinct from trademark infringement law. *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 576 (6th Cir. 2000). Dilution of a trademark is "the lessening of the capacity of a famous mark to identify and distinguish goods and services," regardless of competition between the trademark holder and others or likelihood of confusion. 15 U.S.C. § 1127. In 1995, faced with a "patch-quilt system" of dilution protection under state law, Congress enacted the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125. *See* H.R. REP. NO. 104-374, at 3-4 (1995), *reprinted in* 1996 U.S.C.C.A.N. 1029, 1030. The FTDA provides:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to:
>
> (A) the degree of inherent or acquired distinctiveness of the mark;
> (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
> (C) the duration and extent of advertising and publicity of the mark;
> (D) the geographical extent of the trading area in which the mark is used;
> (E) the channels of trade for the goods or services with which the mark is used;
> (F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;
> (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

5

15 U.S.C. § 1125(c)(1).  The FTDA protects a trademark owner from the erosion of the distinctiveness and prestige of a trademark brought on by "a proliferation of borrowings, that while not degrading the original seller's mark, are so numerous as to deprive the mark of its distinctiveness and hence impact."  *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 801 (6th Cir. 2004) (quoting The Federal Trademark Dilution Act of 1995, Pub. L. No. 104-98, 109 Stat. 985 (1995)); *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 628 (6th Cir. 2003) (Dilution law "only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark.").  In contrast to traditional infringement law, dilution law does not exist to protect the public and is not based on a likelihood of confusion standard.  *Toucan Golf, Inc.*, 337 F.3d at 628;  H.R. REP. NO. 104-374, at 3 ("Dilution is an injury that differs materially from that arising out of the orthodox confusion.  Even in the absence of confusion, the potency of a mark may be debilitated by another's use.").  This distinction results in far greater protection for the trademark holder under the FTDA.  *See Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999) (describing the protection afforded by the FTDA as "tread[ing] very close to granting 'rights in gross' in a trademark.").

The Sixth Circuit has adopted a five-part test for dilution claims first established by the Second Circuit in *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208 (2d Cir. 1999).  *See V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464, 469-70 (6th Cir. 2001), *rev'd on other*

*grounds*, 537 U.S. 418, 428 (2003).[2]  In order to succeed in a federal dilution action, the senior trademark must be (1) famous; and (2) distinctive; (3) the junior use must be in a commercial use in commerce; (4) the junior use must begin after the senior mark has become famous; and (5) the junior use must cause dilution of the distinctive quality of the senior mark.  *AutoZone, Inc.*, 373 F.3d at 802.  In its motion, Studio does not address four of the five elements, confining its argument to the second factor.  That is, whether the EAMES trademark and the lounge chair trade dress configuration are distinctive.

Studio argues that the "distinctive" prong is limited to marks that are "inherently distinctive" as opposed to those that have "acquired distinctiveness."  A mark is inherently distinctive if "[its] intrinsic nature serves to identify a particular source."  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000).  For example, Kodak film, Tide laundry detergent, or Camel cigarettes are inherently distinctive marks.  *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10-11 (2d Cir. 1976).  A trademark possesses "acquired distinctiveness," or secondary meaning, if "in the minds of the public, the primary

---

[2]There is a split among the circuits regarding the required elements of a dilution claim under the FTDA.  The principal dispute relates to whether fame and distinctiveness are separate and independent requirements.  The Second and Sixth Circuits require an independent showing for both fame and distinctiveness.  *Nabisco, Inc.*, 191 F.3d at 216 n. 2; *V Secret Catalogue, Inc.*, 259 F.3d at 469-70.  Thus, both courts employ a five-factor test for dilution claims.  The Third and Ninth Circuits, in contrast, do not treat fame and distinctiveness as separate and distinct requirements.  *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 167 (3d Cir. 2000) ("[W]e are not persuaded that a mark be subject to separate tests for fame and distinctiveness."); *Panavision Intl'l, L.P. v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir. 1998).  Therefore, these courts evaluate FTDA claims under a four-part test.

significance of a [mark] is to identify the source of the product rather than the product itself."

*Wal-Mart Stores, Inc.*, 529 U.S. at 210 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11 (1982)).  The parties do not dispute that Herman Miller's trademark and trade dress are not inherently distinctive and only possess acquired distinctiveness. Surnames, like Eames, are generally regarded as descriptive terms that are not inherently distinctive.  *See e.g., Peaceable Planet, Inc. v. TY, Inc.*, 362 F.3d 986 (7th Cir. 2004); *Larsen v. Terk Techs. Corp.,* 151 F.3d 140, 148 (4th Cir. 1998) ("The use of a surname as a mark . . . is considered to be a descriptive mark and generally must develop secondary meaning in order to receive protection.").  Furthermore,  the Supreme Court has held that the design of a product, such as the design configuration of the lounge chair in this case, is not inherently distinctive, and thus only protectable, upon a showing of secondary meaning.  *Wal-Mart Stores, Inc.*, 529 U.S. at 212, 216.  Studio contends that it is entitled to summary judgment on Herman Miller's dilution claims because neither the EAMES trademark or the design configuration of the lounge chair are inherently distinctive.

Studio's argument is based upon the Second Circuit's interpretation of the FTDA. After establishing the five-part test for dilution claims in *Nabisco*, the Second Circuit further articulated its view of the requirements of the FTDA in *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88 (2d Cir. 2001).  In particular, the court addressed the distinctiveness requirement of the *Nabisco* test.  *TCPIP Holding*, 244 F.3d at 93.  The court held that the FTDA only protected trademarks that were inherently distinctive and did not

extend to descriptive trademarks. *Id*. at 95. Further, the court held that the "distinctiveness" element of the FTDA could not be satisfied simply by a showing of acquired distinctiveness. *Id*. at 97-98. Although the court acknowledged that the FTDA expressly states: "In determining whether a mark is distinctive and famous a court may consider . . . (A) the degree of inherent or acquired distinctiveness of the mark," it dismissed this language as ambiguous without further discussion. *Id*. at 97 (quoting 15 U.S.C. § 1125(c)(1)(A)). The court then rejected two arguments, purportedly based on this statutory language, supporting a construction of the FTDA that allowed the distinctiveness requirement to be satisfied by either inherent distinctiveness or acquired distinctiveness. First, the court rejected an argument that § 1125(c)(1)(A) treated inherent and acquired distinctiveness as equivalent. *Id*. The court reasoned that the two concepts refer to "quite different phenomena." Inherent distinctiveness referred to "a mark's theoretical capacity to serve forcefully as an identifier of its owner's goods"; while acquired distinctiveness was a measure of the recognition "that the mark in fact has earned in the marketplace as a designator of its owner's goods or services, regardless of the mark's innate suitability to serve as a mark." *Id*. Because the two concepts address different phenomena, according to the court, the fact that the statute mentioned both, did not imply that they were equivalent. *Id*.

Second, the court rejected the argument that if acquired distinctiveness did not satisfy the distinctiveness requirement, the statute's reference to it was meaningless and superfluous. *Id*. The court rejected this argument by relying on § 1125(c)(1)(A)'s direction that the factors

enumerated in the statute were pertinent to "whether a mark is *distinctive and famous*." *Id.* (emphasis in original). The court explained that acquired distinctiveness is not superfluous because it is the essential ingredient in the determination of a trademark's fame, the first element of the five-part test under the FTDA. *Id.* According to the court, § 1125(c)(1)(A) encompassed two inquiries: (1) assessing whether the mark achieved a sufficient degree of acquired distinctiveness to satisfy the fame requirement and (2) whether the mark possessed a sufficient degree of inherent distinctiveness to satisfy the distinctive requirement. *Id.* at 98. Moreover, the court explained that if acquired distinctiveness satisfied the distinctiveness requirement of the FTDA, the reference to inherent distinctiveness would be superfluous because every mark that is famous has a high degree of acquired distinctiveness. *Id.* Therefore, if acquired distinctiveness satisfied both the fame and distinctiveness requirements, according to the Second Circuit, there "will never be a case when a court needs to consider whether the mark has inherent distinctiveness." *Id.*

The Second Circuit is the only circuit to have limited the FTDA to inherently distinctive trademarks. *See Avery Dennison Corp.*, 189 F.3d at 877; *Times Mirror Magazines, Inc.*, 212 F.3d at 165-66. The Sixth Circuit has not addressed whether the "distinctiveness" element of a dilution claim is limited to inherent distinctiveness. Of course, this Court is not bound by the Second Circuit's decision in *TCPIP Holding*. Although, in its brief, Studio argues that the Sixth Circuit has adopted the Second Circuit's limitation of the FTDA to inherently distinctive trademarks, it has not pointed to, nor has the Court found, any

10

Sixth Circuit authority announcing such a holding, discussing this issue, or even citing *TCPIP Holding*. It is abundantly clear that the Sixth Circuit has not adopted *TCPIP Holding*, and has not limited the applicability of the FTDA to inherently distinctive trademarks. *See e.g.*, *Metro Sanitation, L.L.C. v. C&R Maintenance, Inc.*, 2005 WL 1861931, *5 (E.D. Mich. Aug. 4, 2005) (Edmunds, J.) (noting that the Sixth Circuit has not limited the distinctive requirement of the FTDA to a showing of inherent distinctiveness); DAVID S. WELKOWITZ, TRADEMARK DILUTION 217 (BNA 2002) ("The *Nabisco* approach has been adopted by the Sixth Circuit, although it has not had occasion to consider the *TCPIP Holding* requirement of inherent distinctiveness."). At oral argument, Studio wisely retreated from their initial position in apparent recognition of the absence of Sixth Circuit authority on the issue. Instead, Studio framed the issue as whether the Sixth Circuit would follow the Second Circuit's view of the distinctiveness prong of the FTDA. Framed in this manner, resolution of Studio's motion is relatively simple, if the Sixth Circuit would interpret the FTDA as limited to inherently distinctive trademarks, Studio's motion should be granted; if not, the motion should be denied.

In support of its argument that the Sixth Circuit would follow *TCPIP Holding*, Studio relies on the Sixth Circuit's adoption of the Second Circuit's five-part test for dilution claims announced in *Nabisco*. *See V Secret Catalogue*, 259 F.3d at 466; *Kellogg Co.*, 209 F.3d at 577. In particular, Studio points to the Sixth Circuit's statement in *V Secret Catalogue* that it was adopting the *Nabisco* test because, "we conclude that the Second Circuit has developed

standards that hew most closely to the Act . . . ." 259 F.3d at 466. Although the Sixth Circuit has adopted the *Nabisco* test for federal dilution claims, it does not necessarily follow that the Sixth Circuit would also adopt the Second Circuit's limitation of the scope of the FTDA announced in *TCPIP Holding*. The Sixth Circuit's commitment to "standards that hew most closely to the [FTDA]," leads this Court to the conclusion that the Sixth Circuit would reject *TCPIP Holding*. The Court declines to follow *TCPIP Holding* because the Second Circuit's interpretation places an unduly restrictive gloss on the FTDA that is contrary to the plain language of the statute and violates well-established canons of statutory construction, under both Sixth Circuit and Supreme Court precedent. Accordingly, Studio's motion for summary judgment on Herman Miller's FTDA claims is denied.

"The starting point in interpreting a statute is its language, for '[i]f the intent of Congress is clear, that is the end of the matter.'" *Hoge v. Honda of America Mfg., Inc.* 384 F.3d 238, 246 (6th Cir. 2004) (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993) (quoting *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842, (1984)); *see also Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989) ("The starting point for our interpretation of a statute is always its language."). Section 1125(c)(1) states in pertinent part: The owner of a famous mark shall be entitled . . . to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the *distinctive quality* of the mark . . . ." 15 U.S.C. § 1125(c)(1) (emphasis added). The plain language of

12

the statute does not limit the applicability of the FTDA to marks with "*inherently* distinctive quality," rather the statute provides protection from dilution of the "distinctive quality" of a famous trademark.   Instead of using a narrow term, Congress selected the broad term "distinctive quality."   In trademark law, distinctiveness has a well-established meaning encompassing both inherent distinctiveness and acquired distinctiveness.   *See e.g.*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) ("The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning.") (emphasis in original); *Wal-Mart Stores, Inc.*, 529 U.S. at 210 (applying similar definition of distinctiveness and noting that "courts have held that a mark can be distinctive in one of two ways.").   "Where Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."   *Neder v. United States*, 527 U.S. 1, 21 (1999) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)) (internal quotation marks omitted); *cf. GenCorp. v. Olin Corp.*, 390 F.3d 433. 448 (6th Cir. 2004) (concluding that Congress' usage of the term "owned or possessed" in CERCLA encompassed constructive possession because the common law had long recognized that "possession" included constructive possession).   There is no indication in the FTDA that Congress intended anything other than the traditional definition of "distinctive." Therefore, the Court must infer that Congress intended to incorporate the established

meaning of the term encompassing *both* inherent distinctiveness and acquired distinctiveness and did not intend to limit the FTDA to famous trademarks possessing only inherent distinctiveness. *TCPIP Holding* does not acknowledge the traditionally broad meaning of "distinctive," instead substituting a limited view extending only to inherently distinctive trademarks. Consequently, *TCPIP Holding* is contrary to the plain language of the statute. While the Second Circuit may be correct that inherent and acquired distinctiveness address "different phenomena," 244 F.3d at 97, the two concepts have always been treated as parts of a single element in trademark law: distinctiveness. *Two Pesos, Inc.*, 505 U.S. at 769. Therefore, Congress' use of the term "distinctive" in the FTDA indicates that the statute was intended to cover trademarks that possessed either inherent distinctiveness or acquired distinctiveness.

In order to limit the FTDA to inherently distinctive trademarks the Court would be required to add the term "inherently" to the language of the statute. Thus, § 1125(c)(1) would read "The owner of a famous mark shall be entitled . . . to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the [inherently] distinctive quality of the mark." § 1125(c)(1). The Court cannot add terms to the language of the statute. As the Sixth Circuit has explained, courts must "resist reading words or elements into a statute that do not appear on its face," and "have a duty to refrain from reading a phrase into a statute

14

when Congress has left it out."  *Hoge*, 384 F.3d at 246-47 (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)); *see also Keene Corp. v. United States*, 508 U.S. 200, 208 (1993).

A further indication of Congress' intent in enacting the FTDA is revealed by comparing the terms used in the main paragraph of § 1125(c)(1) with the terms used in the subsequent paragraph.  While in the initial paragraph Congress referred to "distinctive" and "distinctive quality," in the following paragraph, when enumerating the factors for courts to consider in assessing fame and distinctiveness, it referred to "inherent or acquired distinctiveness." § 1125(c)(1)(A). Presumably, if Congress wished to limit the FTDA to trademarks with "inherent distinctiveness" it would have used this term in the main body of the statute.  *See e.g., Briscoe v. Fine*, 444 F.3d 478, 491 (6th Cir. 2006) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Keene Corp.*, 508 U.S. at 208).  The failure to do so, coupled with the use of the specific term in the following paragraph is another strong indication that Congress did not intend to limit the FTDA to inherently distinctive trademarks.

Furthermore, § 1125(c)(1) also provides that: "In determining whether a mark is distinctive and famous, a court may consider . . . (A) the degree of inherent or acquired distinctiveness of the mark," among other factors.  Although the Second Circuit in *TCPIP Holding* dismissed this language as ambiguous, the Court respectfully disagrees and views this language as clearly indicating that inherent distinctiveness as well as acquired

distinctiveness may be considered in determining whether a trademark is sufficiently distinctive and famous to be protected under the FTDA.  Contrary to the Second Circuit, the Court does not read into the statute a fine distinction within § 1125(c)(1)(A).  *See TCPIP Holding*, 244 F.3d at 98 (holding that § 1125(c)(1)(A) encompasses two inquires: "(1) Has the plaintiff's mark achieved a sufficient degree of consumer recognition ('acquired distinctiveness') to satisfy the Act's requirement of fame? (2) Does the mark possess a sufficient degree of 'inherent distinctiveness' to satisfy the Act's requirement of 'distinctive quality.'").  Rather, the Court believes that the statute meant what it says, that the factors enumerated, including both acquired and inherent distinctiveness, are relevant to and may be considered in determining "whether a mark is distinctive *and* famous," not one or the other.  § 1125(c)(1) (emphasis added).

To the extent that the language is ambiguous, however, a review of the legislative history reveals that Congress did not intend to limit the FTDA to inherently distinctive trademarks.  *See Broadcast Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 769 (6th Cir. 2005) (holding that if a statute's meaning is ambiguous, "a court may look to the legislative history surrounding the adoption of the statute to aid in its determination of the legislature's intention in enacting the statute or provision at issue."); *United States v. Markwood*, 48 F.3d 969, 975 n. 7 (6th Cir. 1995) ("[W]hen there is an ambiguous term in a statute, or when a term is undefined or its meaning unclear from the context of the statute, it is our duty to examine the legislative history in order to render an interpretation that gives

effect to Congress's intent.").  In describing the inclusion of the "degree of inherent or acquired distinctiveness" factor, Congress explained, "[t]he first factor makes it clear that a mark may be deemed 'famous' even if not inherently distinctive, that is, even if the mark is not arbitrary, fanciful, or coined."  H.R. REP. NO. 104-374, at 7, 1996 U.S.C.C.A.N. at 1034. In the well-known classification of trademarks, a mark may be fanciful, arbitrary, suggestive, or descriptive. *Abercrombie & Fitch Co.*, 537 F.2d at 10-11.  Congress' explanation that a mark could be protected under the FTDA without being "fanciful, arbitrary, or coined," is a clear indication that the FTDA is not limited to marks that are inherently distinctive, but also applies to marks with acquired distinctiveness.  Although *TCPIP Holding* referred to another portion of the House Report to support its conclusion that descriptive trademarks are not protected under the FTDA, *see* 244 F.3d at 96, it overlooked the discussion in the legislative history indicating that a trademark may be deemed "famous," and thus protectable under the FTDA, even if it only possesses acquired distinctiveness.[3]

---

[3]Additional evidence of the scope of the FTDA can also be found in the United States Trademark Association ("USTA") Trademark Review Commission's Report and Recommendation on the FTDA.  The USTA originally proposed the language that was eventually adopted by Congress in the FTDA.  *See* WELKOWITZ, TRADEMARK DILUTION, at 219-20.  In the USTA Trademark Commission's Report and Recommendation it, like Congress, indicated that the FTDA was intended to cover both inherently distinctive trademarks and marks with acquired distinctiveness, "[t]he same type of evidence which is traditionally used to prove distinctiveness can be used to prove fame . . . *The first factor, inherent or acquired distinctiveness, makes it clear that enhanced distinctiveness and fame can be acquired regardless of the original nature of the mark.*"  THE UNITED STATES TRADEMARK ASSOCIATION TRADEMARK REVIEW COMMISSION REPORT AND RECOMMENDATIONS TO USTA PRESIDENT AND BOARD OF DIRECTORS, 77 T.M. Rep. 375, 459-60 (1987) (emphasis added).

In its reply, Studio identifies a number of "good policy reasons" for restricting the application of the FTDA to inherently distinctive marks. There may or may not be good policy reasons for restricting dilution protection to inherently distinctive trademarks, however, "[i]t is not the Court's role to address perceived inadequacies in [a statute]." *In re Aberl*, 78 F.3d 241, 244 (6th Cir. 1996). As set forth above, the plain language and legislative history of the FTDA do not indicate that dilution protection is limited to inherently distinctive trademarks, therefore, the Court cannot adopt an interpretation of the statute in direct conflict with Congress' interpretation. *Cline v. General Dynamics Land Systems, Inc.*, 296 F.3d 466, 469 (6th Cir. 2002) ("Moreover, if a court thinks statutory language does not reflect what the court believes the legislators, 'must have' intended, the court may not, under the guise of 'statutory interpretation,' rectify the problem by holding, in effect, that the legislators intended something other than what they declared."), *rev'd on other grounds*, 540 U.S. 581 (2004).

Finally, the Court also notes that the limitation placed upon the FTDA by *TCPIP Holding* has been rejected by various commentators in the trademark field. Professor McCarthy does not agree with the Second Circuit's initial decision in *Nabisco* to elevate "distinctiveness" to a separate requirement from fame, however, assuming that distinctiveness is an independent requirement, he states "my view is that 'distinctive' means the same thing as it has when used for decades in trademark law: this designation has achieved trademark status, either by being inherently distinctive or by acquiring secondary

meaning." 4 McCarthy on Trademarks and Unfair Competition § 24:91.2 (4th ed. 2004). Moreover, he points out that the Second Circuit's definition of distinctiveness as "encompassing only inherently distinctive designations is at odds with generations of usage by courts and the trademark bar," and is inconsistent with the Supreme Court's use of the term. *Id.* (citing *Two Pesos, Inc.*, 506 U.S. at 769). Ultimately, Professor McCarthy concludes, "the Second Circuit has turned down a dead end street on this issue ("distinctiveness" under the FTDA) and must reverse course sooner or later." *Id.* In his treatise on trademark dilution, Professor Welkowitz also indicates that *TCPIP Holding*'s inherently distinctive requirement "conflict[s] squarely" with the legislative history of the FTDA and the interpretative guidance provided by the United States Trademark Association. Welkowitz, Trademark Dilution at 221. Welkowitz also notes that if a "high degree of acquired distinctiveness" is required of all famous marks, "it is difficult to see what role 'inherent distinctiveness' plays as a factor in determining fame, as opposed to distinctiveness." *Id.* Accordingly, in light of the plain language and legislative history of the FTDA, the Court respectfully declines to follow *TCPIP Holding* because it is contrary to the intent of Congress in enacting the FTDA. The distinctiveness element of an FTDA claim

may be satisfied through a showing of acquired distinctiveness.[4]   Studio's motion for summary judgment on Herman Miller's FTDA claims is denied.

Studio also seeks summary judgment on Herman Miller's trademark dilution claims based on Michigan common law.  Studio argues that Michigan has not enacted an anti-dilution statute and has never recognized a common law cause of action for dilution.  Studio's argument is well-taken and the Court will grant Studio's motion for summary judgment on Herman Miller's dilution claims based upon state law.  Herman Miller's attempt to show that a trademark dilution cause of action is recognized under Michigan common law is unavailing.  In support, it points to a footnote in a Sixth Circuit opinion which states, "[t]he dilution doctrine appears to be recognized in Michigan." *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1105 n. 1 (6th Cir. 1991).  This Court has previously addressed the error in relying on *Homeowners Group* for the proposition that Michigan common law recognizes a dilution cause of action:

> *Homeowners* stated that Michigan 'appeared' to recognize such a cause of action by citing *Consolidated Cosmetics* [*v. Neilson Chem. Co.*, 109 F. Supp. 300, 310 (E.D. Mich. 1952)].  *Consolidated Cosmetics*, however, only referred to the law in the First Circuit in discussing dilution, not the common law of Michigan.  One federal court discussing *Consolidated Cosmetics* noted that "[t]he State of Michigan . . . has not legislatively adopted the anti-dilution

---

[4]The Court does not express an opinion on the degree of distinctiveness required to satisfy the distinctiveness prong, but notes that courts often require that a plaintiff demonstrate "a degree of distinctiveness beyond that needed to serve as a trademark." *Than Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 912 n. 14 (9th Cir. 2002); *see also* MCCARTHY ON TRADEMARKS § 24.109 ("To be capable of being diluted, a mark must have a degree of distinctiveness and strength beyond that needed to serve as a trademark.").

doctrine but a United States District Court in Michigan in an opinion, *without adopting the doctrine*, observed that the doctrine has been sparingly applied.

*Aero-Motive Co. v. United States Aeromotive, Inc.*, 922 F. Supp. 29, 47 (W.D. Mich. 1996) (Quist, J.) (emphasis in original) (quoting *Westward Coach Mfg. Co., Inc. v. Ford Motor Co.*, 258 F. Supp. 67, 79 (S.D. Ind. 1966)).  Herman Miller also cites a decision in this Circuit of *Kimberly Knitware, Inc. v. Kimberly Stores Inc. of Michigan*, 331 F. Supp. 1339, 1341-42 (E.D. Mich. 1971) (Feikens, J.), for the proposition that there is a common law dilution cause of action in Michigan.  In providing the plaintiff with a remedy for dilution, the court relied on a trademark treatise and decisions of the Ninth Circuit, Eighth Circuit, and a federal district court in Pennsylvania.  *Kimberly Knitware, Inc.*, 331 F. Supp. at 1342.  Clearly, those cases do not establish that Michigan common law recognizes a dilution cause of action.

Consistent with the previous holdings of this Court, Herman Miller's dilution claims based on state law fail because Michigan does not recognize such a cause of action.  *Aero-Motive Co.*, 922 F. Supp. at 47 ("Michigan, however, has no common law cause of action for trademark dilution."); *Wynn Oil Co. v. American Way Serv. Corp.*, 736 F. Supp. 746, 756 (E.D. Mich. 1990) ("Despite having promulgated extensive regulations governing trade and commerce, the state legislature has yet to enact an antidilution statute.  Neither does the common law in Michigan recognize such a cause."); *aff'd in part and rev'd in part*, 943 F.2d

595 (6th Cir. 1991).[5]   Accordingly, Studio's motion for summary judgment on Herman Miller's state law trademark dilution claims is granted.

B.     *The Fair Use Defense*

The Court now turns to Herman Miller's motion for partial summary judgment on Studio's fair use affirmative defense.  Herman Miller contends that Studio has failed to demonstrate that it is using the Eames' lounge chair descriptively, and therefore, cannot avail itself of the fair use defense.  The fair use defense is a recognition of the fact that trademark protection does not grant the trademark holder a monopoly over the word, image, or device chosen as a trademark, but only grants the holder the exclusive right over the secondary meaning of the mark.  *See, e.g., Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 319 (6th Cir. 2001) ("Under the doctrine of 'fair use,' the holder of a trademark *cannot* prevent others from using the word that forms the trademark in its *primary* or *descriptive* sense.  The only right of exclusion that trademark law creates in a descriptive word is in the secondary, new, 'trademark' meaning of the word that plaintiff has created.")

---

[5]Herman Miller's reliance on *Boron Oil Co. v. Callanan*, 213 N.W.2d 836 (Mich. Ct. App. 1973) is similarly misplaced.  The Michigan Supreme Court has never recognized a common law trademark dilution case of action, nor has any court previously cited *Boron Oil* for the proposition that Michigan recognizes such a cause of action.  In fact, *Boron Oil* appears to address the issue of secondary meaning in the context of an unfair competition case.  213 N.W.2d at 584; *see also Murray Hill Publ'n, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 635 (6th Cir. 2001) (citing *Boron Oil* in the context of an unfair competition claim); *Love v. New York Times Co.*, 691 F.2d 261, 265 (6th Cir. 1982) (same).  Accordingly, *Boron Oil* does not provide any support for Herman Miller's claim that Michigan common law recognizes a trademark dilution cause of action.

(emphasis in original); *Brother Records, Inc. v. Jardine*, 318 F.3d 900, 906 (9th Cir. 2003). The fair use defense is set forth at Section 33(b)(4) of the Lanham Act and applies when "the name, term, or device charged to be an infringement is a use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin." 15 U.S.C. § 1115(b)(4).  In order to prevail in a fair use defense, Studio must show that its use of the lounge chair was "(1) not as a trademark, (2) fair and in good faith, and (3) used 'only to describe' its goods or services." *Review Directories, Inc. v. McLeodusa Publ'g Co.*, 236 F. Supp.2d 810, 812 (W.D. Mich. 2001) (Enslen, J.); *see also ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 639 (7th Cir. 2001).

In the Court's previous summary judgment opinion in this case, it addressed the application of the fair use defense to Studio's marketing and sale of the Eames' lounge chair. Studio argued that its use of Herman Miller's trade dress, the Eames' lounge chair, as a product was a permissible fair use.  The Court rejected this argument and denied Studio's motion for summary judgment because Studio failed to demonstrate that it was using the lounge chair in a descriptive sense.  May 9, 2006 Op. at 16.  Thereafter, in the context of Studio's motion for interlocutory appeal, the Court reiterated that in order for the fair use defense to apply, Studio was required to show that it was using the lounge chair in its primary, descriptive sense.  May 24, 2006 Op. at 5 (citing *ETW Corp.*, 332 F.3d at 920; *Palazzetti*, 270 F.3d at 319; *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267,

23

270 (2d Cir. 1995)). Consistent with the Court's previous opinions, Herman Miller has now moved for summary judgment on the fair use defense, alleging that there is no genuine issue of material fact on the "descriptive use" element of the fair use defense.

Although Herman Miller's motion for summary judgment raises the single issue of whether Studio can satisfy the descriptive use element of the fair use defense, in response, Studio raises a host of issues that are completely non-responsive and irrelevant to this issue. Studio raises such issues as whether Herman Miller has valid trade dress rights in the lounge chair, whether the lounge chair possesses secondary meaning, whether Herman Miller failed to diligently assert its rights in the lounge chair, whether Studio is using the lounge chair as its own trademark, and whether Studio acted in good faith when entering the furniture market. None of these issues addresses the central, and only, issue raised in Herman Miller's motion for summary judgment: whether Studio is using the lounge chair "only to describe" its product. § 1115(b)(4); *Review Directories, Inc.*, 236 F. Supp.2d at 812.[6]

Studio does address the central issue raised in Herman Miller's motion, however, there has been a noticeable shift between Studio's original position in its own motion for summary judgment on fair use and its current position in response to the motion now before the Court. In its original motion for summary judgment, in asserting that the fair use defense protected

---

[6]Many of the issues addressed in Studio's response relate to Herman Miller's actions and use of the lounge chair. Herman Miller's actions have nothing to do with whether Studio is using the lounge chair descriptively and are irrelevant to the fair use defense. *Car-Freshner Corp.*, 70 F.3d at 269; *cf.* MCCARTHY ON TRADEMARKS § 11.45 ("[T]he key is the junior user's descriptive use, not the senior user's descriptive use.").

its actions, Studio alleged that its use of the lounge chair was "only as the furniture product itself" and was "the ultimate example of truly descriptive use." Pl.'s Mot. Summ. J. Br. at 3, 5 (Docket #31). Accordingly, in the Court's previous opinion on fair use, it stated that "Studio uses the lounge chair, Herman Miller's trademark, as a product for sale to the public." May 9, 2005 Op. at 11. In its motion for a certificate of appealability, Studio again described its use of the lounge chair as "selling a product that is a replica of plaintiff's trademark." Pl.'s Br. at 7 (Docket #199). Now, in response to Herman Miller's motion for summary judgment, instead of relying on its use of the lounge chair as a product for sale, Studio relies on *photographs* of the lounge chair used in its advertising as the descriptive use. That is, Studio argues that it uses photographs of the lounge chair in a "visually descriptive, non-trademark manner" only to describe the structural and aesthetic features of the lounge chair. Therefore, based upon this use, Studio contends that it satisfies the descriptive use element of the fair use defense.

Studio's reliance on photographs of the lounge chair is misplaced and distracts from the real issue in this case. Photographs of a plaintiff's trade dress may or may not be actionable as trade dress infringement, however, whether that is true has no relevance to the issue in the present case before the Court because Herman Miller has not alleged that the photographs in Studio's advertising infringe its trade dress rights. The Lanham Act directs that the fair use defense is available where, "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, . . . of a term or device which is

25

descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin."  15 U.S.C. § 1115(b)(4).  Obviously, with respect to Herman Miller's trade dress claim, the use "charged to be an infringement," is not of a name or term.[7]  Rather the use "charged to be an infringement" is of a device, specifically, Studio's production and sale of an exact copy of the Eames' lounge chair.  This is most clearly set forth in Herman Miller's amended complaint: "Defendant is offering for sale an infringing design incorporating substantially all of the features of the distinctive design of the EAMES® Lounge Chair and Ottoman." Pl.'s Amend. Compl. ¶ 27 (Docket #55).  Herman Miller has not alleged that Studio's use of photographs of the lounge chair infringe upon its trade dress.  It alleges that Studio's sale of the Eames' lounge chair reproduction infringes upon its trade dress rights and seeks to preclude Studio from this allegedly infringing activity. The photographs are one step removed from the relevant allegedly infringing use at issue in this case.  Studio must show that its use of the Eames' lounge chair as a product for sale is a descriptive use of Herman Miller's trade dress, not that photographs of the lounge chair are a descriptive use.

Taken to its logical conclusion, the use of the lounge chair photographs does not appear to even address the desired protection Studio seeks under the fair use defense.  As a

---

[7]The Court is only addressing the application of the fair use defense to the lounge chair trade dress, this analysis does not affect either Herman Miller's claim of trademark infringement based upon Studio's use of the name Eames in its advertising and promotional materials or any defenses Studio may assert to that claim.

furniture company, Studio clearly wishes to continue to produce, sell, and reap the profits from its copy of the Eames' lounge chair.  But, assuming that the Court concluded that Studio's use of photographs of the lounge chair met the requirements of the fair use defense, this would only permit Studio to continue to use the photographs, it would provide no protection for Studio's principal use of the lounge chair as a product for sale in the furniture market.  Consequently, Studio's sale of the chair, not the use of photographs of the chair in advertisements, is the relevant use for purposes of this case.

Studio relies on *Rock & Roll Hall of Fame and Museum, Inc. v. Gentile Prods.*, 134 F.3d 749 (6th Cir. 2003), to support its claim that its use of the photographs satisfies the descriptive use element of the fair use defense.  Studio's reliance on this case is misplaced.  In *Rock & Roll Hall of Fame*, plaintiff, the owner of trademarks in the words "The Rock and Roll Hall of Fame" and in the design of the building housing the hall of fame and museum, sued a professional photographer for trademark infringement, dilution, and unfair competition.  134 F.3d at 751.  Plaintiff alleged that defendant's distribution and sale of a poster featuring a photograph of the museum infringed upon both its word mark and its trademark in the building design.  *Id.*  The Sixth Circuit, reversing the district court, held that plaintiff failed to demonstrate a strong likelihood of success on the merits for purposes of a preliminary injunction.  *Id.* at 753.  Specifically, the court concluded that plaintiff did not use its building design as a trademark nor did defendant's poster function as a trademark.  *Id.* at 755.  Further, the court held that the district court failed to properly consider the fair use

defense with regard to defendant's use of plaintiff's word mark.  *Id*. at 756.  Accordingly, the court concluded that plaintiff was unable to show a likelihood of success on the merits justifying a preliminary injunction.  *Id*.

*Rock & Roll Hall of Fame* is completely distinguishable from the present case.  In this case, unlike *Rock & Roll Hall of Fame*, Studio's allegedly infringing use is not a photograph of Herman Miller's trade dress, it is the sale of a reproduction of the trade dress.  *Rock & Roll Hall of Fame* does not address circumstances similar to this case and does not address the descriptive element of the fair use defense as applied to a product configuration.  Nor does it, as Studio contends, hold that a picture of "the Rock and Roll Hall of Fame <u>described</u> the building design."  Def.'s Res. Br. at 22 (Docket #223) (emphasis in original).  In short, *Rock &Roll Hall of Fame* has no application to the present issue before the Court.

Furthermore, as Herman Miller notes, Studio's argument that the photographs describe the various structural and aesthetic features of the lounge chair, appears to be nothing more than a more elaborate, albeit creative, version of its original argument that "the design of the chair and ottoman describe the chair and ottoman."  Def.'s Reply Br. at 1 n. 3 (Docket #110).  Studio has offered the affidavit of Marco Gazziero, a member of Studio's board of directors, in which he explains that the photographs of Studio's lounge chair reproduction: (1) "exemplify the unpatented shell principle found in the plywood furniture designed by Charles Eames," (2) "describe the aesthetically-pleasing combination of leather and rosewood which engenders a look of importance or sophistication, combined with comfort," (3) "describe[]

how the lounge chair is carefully balanced and swiveled for convenience," and (4) "[t]he display of the molded head and armrests directly conveys that the lounge chair is functionally perfect for reading and relaxing." Gazziero Aff. at ¶ 13 (Docket #224). This Court previously held that Studio's succinct argument that the design of the lounge chair describes the lounge chair failed to address its descriptive use of the lounge chair because "[i]t was nothing more than circular logic," and now rejects the expanded version of this argument for the same reason. May 9, 2006 Op. at 13. Gazziero's affidavit fails to create a genuine issue of material fact on the fair use defense.

Studio also contends that the Court must apply the fair use defense in a manner consistent with "current public policy surrounding intellectual property rights," as purportedly established by a recent series of Supreme Court cases. Studio extends the Supreme Court's recent jurisprudence on trademark law well beyond the issues actually addressed in each case in an attempt to connect the decisions to Studio's assertion of the fair use defense. Studio's attempt is unavailing. The cases cited by Studio have limited, if any, relevance to whether Studio is using the lounge chair in a descriptive manner. First, Studio relies on *Wal-Mart Stores*, 529 U.S. 205 (2000), to argue that products are in the first instance merely a product, and therefore, with regard to the fair use defense, the initial, primary descriptive meaning of a product configuration is simply as a product. Based upon this theory, Studio contends that its use of the lounge chair is permissible because it uses the chair in its primary, descriptive meaning as a product. At no point in its discussion of *Wal-*

*Mart Stores* does Studio provide a citation to a specific portion of the case articulating this somewhat metaphysical principle. In fact, a review of the Supreme Court's opinion indicates that the Court may have rejected Studio's position. In a footnote, the Court explained that reference to the secondary meaning of a nonword mark, such as a design configuration, is "often a misnomer," because "*nonword marks ordinarily have no primary meaning*." *Wal-Mart Stores*, 529 U.S. at 211 n. * (emphasis added). This is directly contrary to Studio's notion that a product has a primary meaning as a product.

At best, Studio's argument is an extension of *Wal-Mart Stores* beyond its actual holding. In *Wal-Mart Stores*, the Supreme Court held that, in an action for infringement of unregistered trade dress, a product's design is distinctive, and therefore protectable, only upon a showing of secondary meaning. 529 U.S. at 216. This holding has no relevance to Studio's ability to satisfy the elements of the fair use defense. Studio converts *Wal-Mart Stores*'s holding that a product design is not inherently distinctive and is only protectable upon a showing of secondary meaning into a principle that all products have a primary, descriptive meaning as a product. This argument appears to conflate two distinct trademark law concepts, the distinctiveness required for trademark or trade dress protection and the descriptive use required to assert the fair use defense. *Wal-Mart Stores* does not support Studio's position.

Studio also relies on *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001), in which the Supreme Court considered the effect an expired utility patent had on a

claim of trade dress infringement.  The Court held that a utility patent was strong evidence that the features described in the patent were functional.  *TrafFix Devices, Inc.*, 532 U.S. at 29.  Much like *Wal-Mart Stores*, the issues and holding of *TrafFix Devices* have little or no relevance to the present motion.  Nevertheless, Studio points to dicta in *TrafFix Devices* cautioning against the "misuse or overextension of trade dress" and explaining that "unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying," to argue that Herman Miller's attempt to preclude Studio from copying the Eames' lounge chair is tantamount to a "patent-like monopoly."  Finally, Studio also relies on *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118, 121-22 (2004), a case in which the Supreme Court held that, in order to claim the defense of fair use, a defendant was not required to negate confusion because "some possibility of consumer confusion" was compatible with fair use.  While *KP Permanent Make-Up* did address the fair use defense, it too has nothing to do with the issue presently before the Court.  Studio relies on *KP Permanent Make-Up* to support its position that the Supreme Court is consistently limiting the assertion of broad trademark rights.[8]

Ultimately, while Studio does tacitly acknowledge that *Wal-Mart Stores*, *TrafFix Devices*, *Qualitex* and *KP Permanent Make-Up* do not relate to the issues raised in this case,

---

[8]Studio also cites *Qualitex Co. v. Jacobson Prods., Co.*, 514 U.S. 159 (1995), in further support of its argument that the Supreme Court is curtailing the protection of trademark law.  In *Qualitex*, the Supreme Court held that the color of a product could be protected as a trademark only upon a showing of secondary meaning.  514 U.S. at 162-63.

it argues that, taken together, the cases stand for the principle of limiting broad protection under trademark law and that, in light of this principle, the Court should allow Studio a fair use right to produce its copy of the Eames' lounge chair and should not permit Herman Miller to obtain a monopoly on the lounge chair through trade dress law.  This is less an argument on the merits of the fair use defense than it is an argument for altering the current state of trade dress law.  Assuming that Herman Miller can establish the requirements for trade dress protection and no defenses apply, Studio is likely correct that Herman Miller will have a monopoly on the Eames' lounge chair design, in the sense that Herman Miller can preclude others from using its trade dress in a manner causing confusion as to the source.  While Studio laments this potential outcome, it is consistent with the current state of trade dress law which permits a plaintiff to obtain trade dress protection for the design configuration of its products.  *See e.g.*, *Wal-Mart Stores*, 529 U.S. at 214-15 (noting that trade dress claims can be based both on product packaging or a product design or configuration); *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 630 (6th Cir. 2002) (recognizing that trade dress has been expanded to "include[] the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to customers.") (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995)); MCCARTHY ON TRADEMARKS § 8.4 ("Trade dress includes the total look of a product and its packaging and even includes the

design and shape of the product itself.") (quotation marks omitted).  As explained by the

Supreme Court:

> It is well established that trade dress can be protected under federal law.  The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which *may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods.*  In these respects protection for trade dress exists to promote competition.

*TrafFix Devices, Inc.*, 532 U.S. at 28 (emphasis added).  Studio's fear that it will be unable

to continue to produce the Eames' lounge chair reproduction in the event Herman Miller

prevails on its trade dress claim, while not unfounded, is the result of the current

interpretation of and protection provided by trade dress law, not the failure of the fair use

defense to apply to Studio's usage of the lounge chair.[9]  This argument provides no support

for denying Herman Miller's motion for summary judgment.

In sum, Studio has failed to demonstrate how its sale of an exact replica of Herman

Miller's trade dress is a descriptive use of the lounge chair for purposes of the fair use

---

[9]Moreover, Studio's concern that, if Herman Miller prevails, it will have a monopoly on the Eames' lounge chair without having to obtain a patent, has been rejected by the Sixth Circuit.  In *Esercizio v. Roberts*, 944 F.2d 1235, 1240 (6th Cir. 1991), the court held that plaintiff was entitled to protection under the Lanham Act based upon the distinctive appearance of an automobile's exterior shape.  The court explained, "[t]his trademark protection does not unduly extend the seventeen-year monopoly guaranteed by the patent laws because the two sources of protection are totally separate . . . [Trademark rights] exist independently of [the patent monopoly], under different law and for different reasons." *Esercizio*, 944 F.2d at 1241 (quoting *Application of Mogen David Wine Corp.*, 328 F.2d 925, 930 (1964)).

defense.  In order to assert the fair use defense, Studio was required to show that it is using the trade dress descriptively.  *See, e.g.*, *Review Directories, Inc.*, 236 F. Supp. 2d at 812.  In the absence of evidence creating a genuine issue of material fact on this element, Studio cannot assert the fair use defense.  Studio has not demonstrated that it is using Herman Miller's trade dress in a descriptive manner.  Therefore, consistent with the Court's previous opinions in this matter, the Court holds that Herman Miller's motion for partial summary judgment on Studio's fair use affirmative defense is granted.

III.

For the reasons stated, Studio's motion for summary judgment on Herman Miller's trademark and trade dress dilution claims is granted in part and denied in part.  Furthermore, Herman Miller's motion for partial summary judgment on Studio's fair use affirmative defense is granted.  An order will be entered consistent with this opinion.

Date:   August 22, 2006          /s/ Robert Holmes Bell
                                 ROBERT HOLMES BELL
                                 CHIEF UNITED STATES DISTRICT JUDGE